### In the Interest of D.O.

**JUVENILE OFFICER, Respondent,**

v.

**Catherine Louise
BLACKWELL, Appellant.**

**No. WD 43267.**

Missouri Court of Appeals,
Western District.

April 9, 1991.

---

1.  All sectional citations refer to Revised Statutes of Missouri, 1986.

See also 806 S.W.2d 162.

Charles W. Franklin, Columbia, for appellant.

Gwendolyn S. Froeschner, Columbia, for respondent.

Before NUGENT, C.J., and ULRICH and BRECKENRIDGE, JJ.

NUGENT, Chief Judge.

Catherine L. Blackwell seeks a reversal of the trial court's judgment terminating her parental rights under § 211.447.[1] She contends that the juvenile officer failed to establish grounds for termination by clear, convincing, and cogent evidence, as required by § 211.447.2.

We affirm the judgment of the trial court.

In 1985, a court dissolved Ms. Blackwell's marriage to the father of her two children: B.O., a son, born January 4, 1980, and D.O., a daughter, born October 19, 1981. Soon after that she entered into a relationship with Mike Johnson, who moved

---

**1.** All sectional citations refer to Revised Statutes of Missouri, 1986.

in with her and her children in the fall of 1985.

In September, 1985, staff members at the Boone Hospital Center emergency room examined D.O. for injuries incurred when Mike Johnson, in an outburst of anger, grabbed her so forcefully and placed her in a chair that the child suffered a fractured left forearm. Although she saw the incident and had reason to believe that her daughter suffered pain, Ms. Blackwell failed to seek medical attention for the child for six to ten days. She also neglected to provide follow-up medical care for the injury and removed the cast from the little girl's arm without medical advice.

On October 26, 1985, Mr. Johnson again injured the girl when he grabbed her and pulled her from the back seat to the front seat of the car, causing her to hit her head on the ashtray. Five days later, Ms. Blackwell, who had been drinking, became involved in an automobile accident. Her young son, B.O., in the car at the time, did not have on a seat belt.

On December 22, 1985, a passerby discovered the two children locked alone in the house in the evening, and observed that D.O. had bruises on her face. After learning of this incident, juvenile authorities took the girl to the University of Missouri Medical Center for a physical examination on December 23, 1985. The examination confirmed that D.O. had sustained a black eye and multiple bruises on her face. The child said that Mike Johnson had struck her with his fist. On the same day, the Boone County Juvenile Officer took both children into protective custody.

On October 23, 1987, the children returned to Ms. Blackwell's home for a trial period. Thereafter, their teachers began to express concerns about their welfare, specifically concern about their absenteeism and about B.O.'s clothes, which did not appear warm enough for the cold winter weather. Similarly, during this period, therapists at the Mid–Missouri Mental Health Center noted incidents of physical neglect involving D.O., including uncombed hair, lack of food, and inappropriate clothing for the winter weather.

Then on December 27, 1987, B.O. started a fire in his toy box. In response, Ms. Blackwell whipped him with a belt, despite the fact that at the time she had entered into a Service Agreement with the Division of Family Services in which she agreed to refrain from corporal punishment. After striking B.O. with the belt, she told him, "You can just go hit the road and live on the street." At approximately 8:45 p.m., the seven year old boy left the house wearing no coat despite the rain and cold. He ended up down the road, entangled in a barbed wire fence.

On April 8, 1988, the children again entered judicial custody after B.O. told a counselor at his school that the day before Mike Johnson had hit him with a pool cue because he had not come into the house when called. When questioned at the Columbia Police Department, the children said that Mike Johnson had struck both of them with a pool cue. Physical examinations revealed bruises on their legs and buttocks. The police also questioned their mother about the incident, and she stated that she knew that he had struck her children with the cue. The investigating officer believed that she did not seem overly concerned by the incident.

After their removal from their mother's home, the children lived at Rainbow House in Columbia until April 14, when they entered into foster care. They returned to Rainbow House on April 25, however, because the foster parents had difficulty managing them. Ultimately, both children went to a foster family in Montgomery City, where they still remain.

On April 20, 1988, D.O. told her foster mother that Mike Johnson had sexually abused her. The Division of Family Services learned of that and reported it to the Columbia Police Department. On April 25, police officer Susan Stoltz interviewed D.O. Using anatomically correct dolls, D.O. indicated to Stoltz that Johnson had placed his finger in her vagina and that he had performed cunnilingus upon her. D.O. also indicated that the sexual abuse took place during a period close in time to the pool cue incident.

Following her disclosure of sexual abuse, D.O. began engaging in sexually inappropriate behavior with other children at Rainbow House. Consequently, Mid–Missouri Mental Health Center admitted her on May 31, 1988, and she remained there as an inpatient until she joined her brother with their current foster family on July 14, 1988.

Despite Mike Johnson's repeated acts of abuse upon her children, Ms. Blackwell maintained her live-in relationship with him. He continued to reside in her home after the children's second removal into protective custody and after D.O.'s allegations of sexual abuse. In August, 1988, they vacated the house. Ms. Blackwell moved in with her mother in Jefferson City, and he stayed with friends in Columbia and then spent time in jail. After his release from jail, he and Ms. Blackwell rented a house in Jefferson City and lived together until the end of April, 1989.

As late as September, 1989, Mr. Johnson drove the mother to her visits with her children. In her testimony at the termination hearing on December 15, 1989, she stated that she continued to date him, although not exclusively. She also stated, however, that she did not foresee any long-term commitment to Johnson and that she did not intend to have him present with the children.

William E. Brown, a family counselor working with both children, testified that D.O. had displayed a tremendous amount of anger, fear and resentment, and that these feelings manifested themselves in a pattern of aggressive, disruptive behavior calculated to keep other people at a distance from her. He believed that probably both children had long-term emotional damage. He did not see their having any trust in their mother because of her continued relationship with a man who had abused them. Mr. Brown doubted that the children would ever believe that their mother could protect them, even if Mike Johnson disappeared from the scene. He saw a crucial need for some stability in both children's lives and believed that the children have gradually bonded with their current foster family in a way that establishes a foundation for stability.

Ellen Horowitz, a psychologist who worked with the family at the Mid–Missouri Mental Health Center, testified that Ms. Blackwell appeared to minimize the abuse that occurred in her home and would explain away those events. She treated the abuse as "not really a big deal," an issue best left in the past.

Similar testimony came from Lynn Bradtke, a children's service worker at the Division of Family Services. She believed that the mother had minimized the pool cue incident that led to the children's removal by saying that the children had not really been hurt, that if they had behaved it would not have happened, and that the children should not have been removed from the home because of it. Ms. Bradtke also described Ms. Blackwell's angry reaction to the sexual abuse charges, not wanting to hear about them. She "still seems to prioritize her relationship with Mr. Johnson."

In February and July, 1986, the Division of Family Services had Ms. Blackwell participate in "parenting" classes. She attended all of the February classes, but did not pass because of her lack of participation, her apparent resistance to change, and her attitude that she had no problems as a parent. She and Mike Johnson both attended most of the July classes but did not pass because of their denial, anger, and apparent inability to apply or understand the concepts. Ms. Bradtke also testified that in August, 1988, and January, 1989, Ms. Blackwell failed to sign a service agreement with the Division. She finally signed one in May, 1989.

Ms. Bradtke stated that the children did have some level of emotional attachment to their mother, but they also lacked trust in her and they did not believe that she could or would protect them. Ms. Bradtke saw as the most serious problem between the mother and her children her failure to protect them. In Ms. Bradtke's opinion, the Division could provide no further services to cause the type of change that would ensure the children's future safety. Al-

though the mother has had a great deal of counseling, she had seemed not to benefit from it, and her circumstances had not changed to any significant degree. Ms. Bradtke's assessment would not change even if Ms. Blackwell completely severed her relationship with Mike Johnson.

Following the termination hearing, the trial court found that the children's mother had exposed D.O. to recurrent acts of physical abuse by Mike Johnson under circumstances that indicated that she knew such acts had occurred. The trial court also found that the juvenile court had jurisdiction over D.O. for over one year, that the conditions that led to the assumption of the juvenile court's jurisdiction persisted, that little likelihood existed that those conditions would change in the near future, and that the continuation of the parent-child relationship would greatly diminish D.O.'s prospects for early integration into a stable and permanent home. Based on those findings, the court terminated Ms. Blackwell's parental rights to D.O. pursuant to § 211.447.2.

As her sole point on appeal, Ms. Blackwell contends that the juvenile officer failed to establish grounds for termination by clear, convincing, and cogent evidence, as required by § 211.447.2. More specifically, she claims that the evidence did not show that she knew or should have known that Mike Johnson repeatedly abused her children.

The termination of parental rights requires the trial court to find clear, cogent, and convincing evidence of a violation of one or more of the statutory conditions set forth in § 211.447. *In the Interest of A.M.K.*, 723 S.W.2d 50, 52 (Mo.App.1986). We give due regard to the trial court's opportunity to judge the credibility of the witnesses, and we will affirm its judgment unless no substantial evidence supports it, unless the weight of the evidence compels a different result, or unless it erroneously declares or applies the law. *In the Interest of M.E.W.*, 729 S.W.2d 194, 195–96 (Mo. 1987) (en banc). The primary concern of the court in a parental termination hearing remains the best interest of the child. *Id.* at 195.

Here, the trial court based its termination on the statutory grounds found in § 211.447.2(2)(c), which provides for termination under circumstances where the court finds a sufficient showing of

[a] severe act or recurrent acts of physical, emotional or sexual abuse toward the child *or any child in the family* by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family.

Sufficient evidence sustained the trial court's termination of Ms. Blackwell's parental rights on this statutory ground. The *foregoing* history of abuse, compels us to conclude that Ms. Blackwell knew or should have known of Mike Johnson's acts against her children in her home at or near the time they occurred.

In its findings of fact and conclusions of law, the trial court also indicated an additional ground for termination in the provisions of § 211.447.2(3) that permits termination where

[t]he child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

Ms. Blackwell contests the trial court's conclusion that she has failed to remedy the conditions that led to the juvenile court's assumption of jurisdiction. In support of her contention that she has rectified the situation, she notes that, at the time of trial, she had not lived with Mike Johnson for several months, that she had testified that she had no intention of reestablishing her former relationship with him, and that her current counseling program went well.

Whether the natural parent's home environment continues to pose a threat to a child based on the proof of prior neglect or abuse remains a question for the trial judge to resolve under subjective standards. *K.S. v. M.N.W.*, 713 S.W.2d 858, 865 (Mo.App.1986). In reaching that judgment, the court considers factors including the nature and extent of the past abuse and neglect, the length of the separation between parent and child and the placement options. *Id.* Whether a parent has reformed constitutes but one consideration and, of course, the trial judge may reject that, as it may any other evidence presented. *Id.*

Ms. Blackwell's claims of reformation and rectified home conditions fail to persuade us to reverse the trial court's decision. Competent evidence demonstrates her most serious difficulty as her inability to protect her children, and shows that the difficulties caused by this inability would persist regardless of Mike Johnson's potential absence from the scene. We cannot justify a finding that the trial court erred in determining that D.O.'s best interests lie in the termination of her mother's parental rights.

Accordingly, we affirm the judgment of the trial court.

All concur.